# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00346 (BAH)** |
| **v.** | : | |
| | : | |
| **GLEN MITCHELL SIMON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth herein, the government requests that this Court sentence Glen Mitchell Simon to 10 months of incarceration, the middle of the applicable Sentencing Guidelines range, one year of supervised release, 60 hours of community service and $500 in restitution.

### I.    Introduction

> *"Look at these little fucking spineless fucking oath violating little fucking weasels out there . . . threatening us with tear gas."* Glen Mitchell Simon, comments directed at police officers protecting the Capitol, January 6, 2021

The defendant, Glen Mitchell Simon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On April 29, 2022, Simon pled guilty to one count of violating 18 USC § 1752(a)(2): Disorderly and Disruptive Conduct in a Restricted Building or Grounds. As explained herein, a sentence of 10 months, with another year of supervised release to follow, is appropriate in this case because Simon: (1) arrived at the Capitol prepared for violence by wearing a plated vest; (2) along with his fellow rioters, pushed a bicycle rack against a line of officers, making physical contact with them and pushing them back; (3) mocked police officers as they attempted to defend the Capitol Building and loudly urged his fellow rioters to put "fear" into the  officers;  (4) sought out Members of Congress while he was inside the Capitol and urged his fellow rioters to do the same; (5) stayed inside the Capitol for over one hour; (6) actively resisted police officers' efforts to clear the Rotunda; (7) vaingloriously celebrated the riot when interviewed by a local newspaper reporter a week afterwards; (8) lied to the FBI about the extent of his participation in the events of January 6, 2021; and (9) has a conviction for disorderly conduct/fighting.

The Court must also consider that Simon's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot would likely have failed. Here, Simon's participation in a riot that actually succeeded in halting the Congressional certification combined with the aggravating factors set out herein renders a sentence of incarceration both necessary and appropriate in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government incorporates by reference the general summary of the attack on the U.S. Capitol set forth in ECF 52 (Statement of Offense), at ¶¶ 1-7.

As this Court knows, a riot cannot occur without rioters, and each rioters' actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. *See United States v. Jesus Rivera*, 1:21-cr-00060 (CKK), (ECF 62 at 13) ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the flood waters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption.").

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Figure 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd

already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Figure 1.  They flooded the area labeled "Lower West Plaza" Area C on Figure 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left) to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.





*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

With that backdrop we turn to Simon's conduct and behavior on January 6.

*Glen Mitchell Simon's Role in the January 6, 2021 Attack*

On January 6, 2021, Simon traveled to Washington D.C. from Maine. He came prepared for violence. On that date, he was wearing a tactical "plate carrier" vest with ballistic plate inserts.

 

*Figure 5*:  Simon wearing a plate carrier vest (front and back).

After listening to several speakers at the Washington Monument, Simon made his way to the West Lawn of the Capitol. He then made his way through the crowd until he was at the foot of the inaugural stage near the Lower West Terrace. Access onto the Lower West Terrace and the Capitol building was protected by bicycle racks linked together and manned by police officers. From his vantage point at the front of the West Lawn Simon could observe the crowd as they confronted the officers who were struggling to prevent people from crossing through the barrier.

While recording video on his cell phone, Simon began to ridicule the officers, stating "[l]ook at these little fucking spineless fucking oath violating little fucking weasels out there . . . threatening us with tear gas." (ECF 50, Exhibit 1). As shouts of "traitors" filled the air, Simon joined other rioters in pushing a bicycle rack into a line of officers who desperately tried to maintain the perimeter. (ECF 50, Exhibit 4, 5, 6).



*Figure 6: Simon joins other rioters in pushing metal barrier*

After breeching the perimeter established by the police, Simon made his way to the Upper West Terrace where he entered into the Capitol building through the Senate Wing door at 2:14 p.m., approximately two minutes after it was initially breached.



*Figure 7:* Simon enters Senate Wing Door at 2:14 p.m.

Once inside, Simon made his way to the Crypt, where police officers had formed another perimeter in an effort to prevent rioters from going further into the Capitol building. While at the Crypt, Simon recorded a video on his cell phone in which he yelled and chanted in the direction of police so long and loudly that his voice became hoarse.   The verbal assault included the following statements:

- "This is what a tyrannical government gets treated like. We bust in this bitch and show 'em who the fucking boss really is."
- "This is what a revolution looks like, folks. This is what happens when the people are fucked with, over and over and over again. Fucked with over and over again. This is what happens when the people get tired of it. *We fucking bust that fucking door down. The boys busted the windows in, busted the door down*, and we started pouring in here. This our house. This is our house, folks. This is what a revolution looks like. This is what happens. This is what gets shit done. We barge up in their shit and show 'em who's boss."
- "Our house!  *They're all terrified*. This is what happens. This is what happens, folks. This is what happens when the people get tired. This is what happens. Gotta show these fuckers we ain't fucking around. It's the only way to get it done. *Fear! We gotta scare the fuck out of 'em.*"
- "Alright, folks. *I think we're gonna make another charge* . . .  I'll fill you in once we go."

 (ECF 50, Exhibit 2).  At the conclusion of Simon's video, the rioters overtook the line of police officers.  It is unclear whether Simon was involved in this "charge."



*Figure 8: "You got to show these fuckers we ain't fucking around. It's the only way to get things done . . . FEAR . . . you got to scare the fuck out of them."* Glen Simon (ECF 50, Exhibit 2 at 4:17).

Next, Simon went upstairs and through Statuary Hall and the Statuary Hall Connector. While near Statuary Hall, he recorded another video during which he had the following conversation with a third party:

<u>Simon</u>: Is this it right here?

<u>Third party</u>: Congress is that way.

<u>Simon</u>: *Why the fuck are we going over here?* Hey, hey. Woo! Alright folks we up in this son of a bitch. We're up in this thing. Hey, did they invite us in here?

<u>Third party</u>: No.

<u>Simon</u>: Did they invite us in? Fuck no they didn't This is our house. *Free men don't ask for permission.*

(ECF 50, Exhibit 3).

Following this conversation, Simon walked from the Statuary Hall Connector into the Rotunda.



*Figure 9:* Simon in the Statutory Hall Connector

From about 3:06 p.m. to 3:14 p.m., police formed a line and pushed rioters out of the Rotunda and, ultimately, out of the building. Surveillance footage shows Simon actively resisting the officer's efforts to clear the Rotunda. (ECF 50, Exhibit 7). It does not appear from the footage that Simon physically contacted a police officer during these altercations. The government obtained open-source footage of this incident, as well. Two stills from this footage are copied below. In the first image below, Simon appears to have his fists raised. In the second image below, Simon appears to be pushing against the backpack of the rioters in front of him, against the line of police officers that are attempting to force the rioters out of the Rotunda.





*Figure 10 & 11:* Simon (red square) in Rotunda

Simon finally exited the Capitol building at around 3:17 p.m., over an hour after initially entering.  An image of Simon exiting the building from Capitol surveillance footage is below.



*Figure 12:* Simon exiting the Capitol

After exiting the building, Simon posted to Facebook a photograph of himself pumping his fist with an individual dressed as an eagle. He captioned the post, "Feel like I took about 50 bong rips of pepper spray today. Post victory picture after the ramming through of the capital building #FreemanDontaskmotherfucker #congressranawayscared #theythoughtwewouldent" (sic)."



*Figure 13: Simon's Facebook Post*

*Simon's Statements and Actions After January 6, 2021*

On January 14, 2021, Simon was interviewed by a reporter from the Lewiston Sun Journal, a newspaper published in Lewiston, Maine.[2]  In the article, Simon blamed the police for the riot, claiming "somewhere on the police side of the line" there was "deep, heavy, tribal music pounding" and "one or two lady police officers got a little trigger happy and started shooting people with paintballs." Simon explained the attack on the Capitol stating that "[p]eople are sick and tired of seeing these vicious bloodsucking" law makers carving up America and creating "mischief and

---

[2] Steve Collins, *Minot man who marched at Capitol says crowd full of 'patriots,'* Lewiston Sun Journal (January 14, 2021), https://www.sunjournal.com/2021/01/14/what-a-minot-man-saw-at-the-us-capitol-during-last-weeks-mayhem/.

mayhem." The article stated that "[d]espite the fallout from the event, including a growing number of arrests and a second impeachment for Trump for inciting the takeover, Simon said he would go to Washington again."  The article also quotes Simon as saying that it is important for "patriots" to let their country know "here is a group of people who love America enough to show up." "That is the people's place. We own that place. We're barred from our own building. They want to say we breached it, but, well, it's ours."  Despite this bravado, Simon denied to the reporter that he went inside the Capitol.

The following day, on January 15, 2021, FBI agents contacted Simon by phone.  During this call, Simon twice lied to the agents.  First, he claimed he did not enter the Capitol building. Second, he said he did not take any photographs or video in Washington, D.C. on January 6, 2021. He also asserted that, while he was on Capitol grounds, he was helping police officers who were being attacked.  The government has uncovered no evidence of Simon assisting police officers while on Capitol grounds.  On the contrary, as described above, Simon attempted to push past officers manning the bicycle racks and resisted their efforts to clear the Rotunda. Simon admitted that he wore a plate carrier vest with ballistic plates to the January 6, 2021 riot.

When agents questioned Simon on his use of the word "we" when referring to his travels Simons insisted that "we" is how he refers to himself and was not an indication of him traveling with others. Simon denied being part of any group or organization that planned to attend the January 6 rally. Video from the Senate Wing Door, however, appears to show that immediately upon entering the Capitol, the defendant was communicating with at least one other individual and when Simon ventured deeper into the Capitol, he beckoned others to follow.



*Figure 14:* Simon makes eye-contact with individual upon entering Capitol



*Figure 15:* Simon beckons others

After a warrant was issued for his arrest, Simon was notified of the warrant and self-surrendered to the FBI. He was interviewed at the time of arrest. During the interview, Simon confirmed that he was the individual in the photograph posted to Facebook standing on the U.S. Capitol steps with the bald eagle, but he denied entering the U.S. Capitol building.

*The Charges and Plea Agreement*

On April 12, 2021, Simon was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D). On May 5, 2021, he was arrested in Gainesville, Georgia. On May 7, 2021, Simon was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 15, 2021, he pleaded guilty to Count Four of the Information, 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, or Demonstrating in a Capitol Building.[3] In preparation for sentencing the government first became aware that Simon had pushed the metal barrier rack into the line of police officers and actively resisted efforts to clear the Rotunda. Consequently, the parties engaged in further plea negotiations.[4] Ultimately, on April 29, 2022, Simon withdrew his guilty plea to Count Four and pled guilty to Count Two of the Information, 18 U.S.C. §§ 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds. By plea agreement, Simon agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

---

[3] A formal plea offer was extended to the defendant via letter to his counsel on July 22, 2021. Defense counsel notified the government that Mr. Simon would accept the plea offer on August 6, 2021.

[4] The government notified defense counsel of the additional evidence on January 25, 2022, and extended a second plea offer to the defendant via letter on January 28, 2022. Defense counsel notified the government that Mr. Simon would accept the second plea offer on April 22, 2022.

Simon now has been convicted of violating 18 U.S.C. §§ 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Simon faces up to one year of imprisonment; a fine of up to $100,000; and a term of supervised release of not more than one year. Simon must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

*The Sentencing Guidelines and Guidelines Analysis*

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

In the plea agreement, the parties stipulated to an "Estimated Offense Level Under the Guidelines," of 13. ECF 51 at pp. 2-3. [5] The United States Probation Office carried out its own calculation of the applicable offense level and reached the same result:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Specific Offense Characteristics (U.S.S.G. §2A2.4(b)(1)(A)) (physical contact with police officer) | 3 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |

---

[5] The guideline calculation in the plea agreement projected an imprisonment range of 8-14 months. The government agrees that because the statutorily authorized maximum sentence is one year, guideline range becomes 8 to 12 months. See U.S.S.G. §5G1.1(c)(1).

Total Adjusted Offense Level                                          11

*See* PSR at ¶¶ 26-27(h).

The Probation Office calculated Simon's criminal history as a category I, which takes into account a 2011 conviction for disorderly conduct and fighting. PSR at ¶¶ 29-30. The government does not dispute that determination. Accordingly, the Probation Office calculated the Guidelines advisory imprisonment range at 8-12 months. PSR at ¶¶ 27, 85.  Simon's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id*. at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a significant period of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant should be sentenced based on their individual conduct, each person who unlawfully entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with police officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, the Court should address Simon's individual conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. In this case, many of these factors favor a period of incarceration.

23

To be clear, had Simon personally engaged in violence beyond what is described in this memorandum he would be facing additional charges and/or penalties associated with that conduct. The absence of additional violent acts on Simon's part is therefore not a mitigating factor, nor does it meaningfully distinguish Simon from most other defendants.

The nature and circumstances of Simon's crime weighs strongly in favor of a term of incarceration in the middle of the agreed-upon Guidelines range.  Simon arrived at the Capitol on January 6 prepared for violence. As evidenced by the video footage and his admissions to the FBI, he wore body armor: a tactical vest containing ballistic plates. The implication of this is startling as this type of armor is designed to be worn by those entering high-risk situations and provides protection against bullets.[6] Simon also caused physical contact with police officers when he joined other rioters attempting to overpower officers by pushing a metal barrier set up as a permitter into them. Additionally, Simon entered the Capitol just minutes after the initial breach of the Senate Wing door and he remained inside for over an hour. During that time, he traveled to the Crypt, up a flight of stairs to Statuary Hall and the Statuary Hall Connector, into the Rotunda, and, finally, exited through the East Rotunda Doors. While in the Crypt, Simon, at the very least, demonstrated a willingness to defy police efforts to clear the area. His statements, however, suggest a more active resistance as Simon stated: "Alright, folks. I think we're gonna make *another charge*. I'll fill you in once we go."  Similarly, when Simon moved to the Rotunda, he actively resisted officer's efforts to clear the room.

Simon made unusually inflammatory statements on January 6, 2021, and afterwards. First, while Simon was on U.S. Capitol grounds, he ridiculed police officers, including calling them

---

[6] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Guide-0101.06, Selection and Application Guide to Ballistic-Resistant Body Armor for Law Enforcement, Corrections and Public Safety, pg. 5. https://www.ojp.gov/pdffiles1/nij/247281.pdf

"little fucking spineless fucking oath violating little fucking weasels." Inside the Capitol building, Simon encouraged rioters to terrify police officers, including by shouting, "This is what a tyrannical government gets treated like. We bust in this bitch and show 'em who the fucking boss really is" and "Our house!  They're all terrified . . .  Gotta show these fuckers we ain't fucking around. It's the only way to get it done. Fear! We gotta scare the fuck outta them."  He also indicated his desire to find Congress by asking a third party, "Is this it right here?"  The third party responds, "Congress is that way."  Simon answers, "Why the fuck are we going over here? Hey, hey. Woo! Alright folks we up in this son of a bitch."

In addition, Simon celebrated property destruction.  In the Crypt, Simon repeatedly spoke of "bust[ing] windows in" and "the door down." Additionally, Simon stated, "This is what happens when the people get tired of it. We fucking bust that fucking door down. The boys busted the windows in, busted the door down, and we started pouring. This our house."  Also, Simon captioned the Facebook post of himself posing with an individual dressed as an eagle, "Post victory picture after the ramming through of the capital (sic) building."

Finally, Simon's statement that he is "very sorry" (PSR at 8) is inconsistent with statements he made following the attack on the Capitol. After exiting the Capitol building, and in the days following the riot, Simon continued to publicly contend that the elected members of Congress were criminals and that the rioters were justified in their actions. He made additional statements about the riot – on social media, to a local newspaper, and to the FBI.  The photo he posted of himself and an individual dressed as an eagle included several inflammatory hashtags, including "#FreemanDontaskmotherfucker" and "#congressranawayscared."  About a week after the riot on January 6, 2021, Simon was interviewed by a local newspaper in Maine. In the article, Simon said Congress was full of "absolutely grimy, disgusting monsters" who were "vicious" and

"bloodsucking."  He also said, "That is the people's place. We own that place. We're barred from our own building. They want to say we breached it, but, well, it's ours."  Finally, on January 15, 2021, during a telephone call with FBI agents, Simon repeatedly lied that he did not enter the Capitol building and did not take any photographs or videos in Washington, D.C. on January 6, 2021.

Accordingly. the nature and circumstances of the offense establish the clear need for a significant sentence of incarceration.

### B.  Simon's History and Characteristics

As set forth in the PSR, Simon's criminal history consists of one conviction of Disorderly Conduct, Fighting - an incident occurring in 2011 wherein he admitted striking an individual three times. During that prosecution the court issued arrest warrants twice for Simon's failure to appear, on March 27 and again on April 7, 2012. Notably, the court in that case imposed the sentence – a $200 fine – on January 4, 2021, just two days before the Capitol riot.  Simon also has a pending charge of battery for an incident occurring on July 17, 2019. The affidavit in that case states Simon punched an individual causing substantial and visible physical harm. ECF 22 ¶ 33. The disposition of the Battery charge is unknown at this time.

Simon has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[7]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Glen Simon has a past criminal history for assaulting another person. He arrived at the Capitol on January 6 prepared for further violence. He willingly engaged in physical force in an effort to push past officers. He implored others to use fear as a tactic to intimidate the police and showed disdain for the officers protecting the Capitol in his statements directed towards them. He celebrated his actions with bravado on social media and to his local newspaper. Simon's conduct clearly establishes that he should be specifically deterred with a prison sentence in the middle of the Guidelines range.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[9]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that

---

[8] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Likewise, those convicted of misdemeanor offenses and who engaged in conduct that obstructed or impeded government business have been given harsher punishments than those who simply trespassed.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences – such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), and whether they destroyed evidence of their participation in the breach – help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as expressions of remorse or cooperation with law enforcement. See *United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. E.g., *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was sui generis: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer

of Presidential power, the use of violence by a substantial number of rioters against police officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

*Defendants convicted of § 1752(a)(2)*

As of July 7, 2022, there have only been three completed sentencings for a defendant in which § 1752(a)(2) was the most serious offense of conviction.[10]

1. *United States v. Marquez*, (21-CR-136-RC)

On January 6, 2021, Marquez attended the rally at the Ellipse and then made his way to the Capitol. While outside the Capitol, he recorded himself encouraging others to climb the wall on the west side of the building. Marquez breached the Senate Wing doors 20 seconds after they initially had been forced open. Once inside, Marquez filmed several clips with his cell phone chanting "USA!" and "Woo-hoo!" Marquez repeatedly attempted to "fist-bump" officers, even tapping an officer's shoulder to try and get his attention. Marquez made his way from the Senate Wing doors foyer to the office of Senator Merkley with at least 20 other rioters. He filmed himself in the office, including his own use of a vape pen for smoking.

After about 10 minutes, Marquez made his way to the Crypt, where he cheered on other rioters. He was also seen by the House Wing door, the Hall of Columns, and again by the Senate

---

[10] Greg Rubenacker (21-CR-193-BAH) was also sentenced for a violation of 18 U.S.C. § 1752(a)(2), though the guidelines for that offense were subsumed by the higher guidelines for Rubenacker's numerous felony offenses based on grouping. *See* Case No. 21-CR-193-BAH, TRANSCRIPT OF SENTENCING HEARING, dated May 26, 2022, at p. 81, ln. 15 – p. 83, ln. 3. That said, the Presentence Investigation Report listed the applicable guideline for Rubenacker's § 1752(a)(2) conviction as U.S.S.G. § 2A2.4. *See* Case No. 21-CR-193-BAH, Doc. 52 ("PSR") at ¶ 46.

Wing doors. He spent nearly an hour in the building.  After being escorted out, Marquez gave two thumbs up to the crowd outside.  Upon returning home, Marquez filmed a YouTube video admitting to the Capitol breach, and joyfully rapping about it.  At the time of his arrest, Marquez admitted to going in the Capitol and that he did so to, amongst other things, "protest communism." *See* Case No. 21-CR-136-RC, Doc. 28 ("Sentencing Memorandum"), at 2-15. Marquez was sentenced to 18 months of probation which included home confinement for a period of three months.

Marquez's conduct and his sentence can be readily distinguished from Simon's. First, the plea agreement in the Marquez case included a stipulation that U.S.S.G. § 2B2.3, and its Base Offense Level 4, was the applicable Chapter Guideline. That was an error, which the government admitted in its sentencing memorandum in that case. See Case No. 21-CR-136-RC, Doc. 28 ("Government's Sentencing Memorandum"), at p. 18, n.6 (noting that "[b]ecause the government agreed in the plea agreement that U.S.S.G. § 2B2.3 is the applicable Guideline here, we do not object to its use in this case. Upon further review of the applicable law and principles, however, the government has concluded that U.S.S.G. § 2A2.4 is the appropriate Guideline for a violation of 18 U.S.C. § 1752(a)(2).").

Because of the application of the § 2B2.3 Guideline Marquez's base offense level was 4 resulting in a guideline range of imprisonment of 0 to 6 months. See Case No. 21-CR-136-RC, Tr. 12/10/21 at 7.  Marquez also did not engage in any violent or assaultive type behavior with his most egregious conduct being the entering of Senator Merkley's office.  Significantly, there was no evidence that Marquez was attempting to locate Members of Congress and urged others to do the same while he was inside the Capitol. That is extremely egregious conduct. Had the rioters, some of whom were baying for blood on January 6, located and got their hands on any Members

of Congress on January 6, the tragedy of that day would have been significantly worse than it turned out to be.

Additionally, and probably most significantly, it appears that Marquez's sentence was heavily influenced by considerations concerning the defendant's mental health issues.   In pronouncing sentence Judge Contreras noted Marquez's "struggles" and that the presentence report had sealed information that had been submitted by defense counsel. Judge Contreras stated he would not address Marquez's "serious mental health issues" at length but noted that he agreed with defense counsel's representation. See Case No. 21-CR-136-RC, Tr. 12/10/21 at 24.

2. *United States v. Bromley,* (21-CR-250-PLF)

Between the November 2020 election and January 6, 2021, Bromley repeatedly texted family and friends statements and images regarding the nation being "at war" using violent language and imagery.  On January 2, 2021, Bromley texted a friend: "We are moving the line forward on [January 6].  They don't have enough police or bullets to stop us. Long live our republic and all glory/victory to GOD."  He texted another person that day that he may not "come back alive" from Washington D.C.  On January 4, 2021, Bromley and his cousin drove from Alabama up to Washington D.C.  On January 6, 2021, he texted that there would be a "fight coming today."  Bromley attended President Trump's rally by the Ellipse.  Afterwards, he and the cousin made their way to the Capitol and were two of the first people to arrive at the front House doors.  As four officers moved between the rioters and the doors, Bromley joined others in screaming at them – including, "honor your oath!"

Some of the rioters in this initial crowd, including Bromley's cousin, attacked the officers. Bromley's cousin used a flagpole to strike an officer.  The outnumbered officers retreated inside the Capitol and shut the doors.  Bromley reached in his pocket and handed his cousin a metal baton,

which the cousin used to beat the windows and doors with.  The doors were later opened from the inside by other rioters, at which point, Bromley made entry.

Bromley immediately made his way to the Speaker's Lobby, and witnessed Ashli Babbitt being fatally shot there.  He stayed in the area for nine minutes, then was forced out of the building by police officers.  After his arrest, during his interview with FBI, Bromley made several self-serving statements that were contradicted by CCTV recordings of his conduct at the Columbus Doors.  *See* Case No. 21-CR- 250-PLF, Doc. 42 ("Sentencing Memorandum"), at 1-17.  U.S.S.G. § 2A2.4 was correctly applied to Bromley's conduct with a resulting sentencing guideline range of 6 to 12 months.   See Case No. 21-CR-250-PLF, Doc. 42 ("Government's Sentencing Memorandum"), at p. 18. Judge Friedman sentenced Bromley to 3 months of incarceration followed by 1 year of supervised release. See Case No. 21-CR-250-PLF, Minute Entry 6/29/2022).

Although Bromley, like Simon here, engaged in heated rhetoric with police officers, Simon's conduct was worse than Bromley's. First, Simon appeared to be searching for members of Congress when he entered the Capitol. There is no evidence that Bromley did that. Second, while Bromley shouted that police officers should "honor" their oath, he did not implore others to use fear as a method of intimidation. Finally, and most significantly, while Simon pushed a metal barrier into police officers and actively resisted efforts to be removed from the Rotunda, there is no evidence that Bromley had any personal contact with police officers. A sentence of 10 months incarceration in this case would not create an unwarranted disparity with Judge Friedman's sentence in the *Bromley* case.

3. *United States v. Sidorski,* (21-CR-0048-ABJ)

On January 6, 2021, Sidorski traveled to Washington D.C. where he attended President Trump's rally by the Ellipse. Afterwards, he made his way to the U.S. Capitol and to the west side

of the Capitol where he observed individuals in the crowd shouting obscenities at a line of Metropolitan Police Department officers, including officers walking toward the Capitol. Others in the crowd began pushing and fighting with the officers.  At one point, Sidorski made physical contact with an officer who was engaged in a physical conflict with another individual.  For a three-second period, he grabbed with and placed his left hand on the officer's left shoulder and left arm in an apparent attempt to prevent the officer from utilizing that left arm during the physical conflict.

After this confrontation, Sidorski entered the Capitol Building through the Senate Wing Door at 2:14 p.m., approximately one minute after the door had been kicked in and the adjoining windows smashed and remained inside for approximately 37 minutes, leaving at 2:51 p.m. *See* Case No. 21-CR-0048-ABJ, Doc. 42. ("Sentencing Memorandum"), at 3-18. Judge Berman Jackson sentenced Sidorski to 100 days of incarceration followed by 12 months of supervised release.

Although Sidorski, like Simon, made contact with a police officer, Simon's conduct is distinguishable. First, there was no evidence Sidorski came to the Capitol on January 6 prepared for violence. Nor was there evidence that he tried to locate Members of Congress. Sidorski's physical contact with the officer was brief and was a hand applied to a shoulder and arm – not thrusting a heavy metal barrier at a line of police officers. Lastly, Simon engaged with officers both outside and inside the Capitol. There is no evidence that Sidorski had multiple interactions.

*Defendants convicted of felonious conduct*

In addition to the cases set forth above, other Capitol breach defendants who made physical contact with police officers have received significant terms of incarceration. In *United States v. Mostofsky,* 21-cr-138-JEB, the defendant, like Simon, pushed a metal barrier rack into officers

before entering the Capitol where he stayed for 20 minutes, stealing Capitol Police protective gear along the way. Judge Boasberg sentenced Mostofsky to 8 months' incarceration, two months below the 10 to 16 months set forth in the sentencing guidelines, followed by 12 months supervised release for the offense of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)[11]. In doing so, the court observed that "without conduct like yours, without people on the front lines pushing, the barricades wouldn't have fallen, the Capitol would not have been overrun, people would not have been killed, others would not have suffered serious physical and mental injuries." *Id* (ECF 112 at pg. 41).

In *United States v. Daniel Johnson*, 21-cr-407-DLF the defendant, along with his father, climbed through a window near the Senate Wing door and made his way to the Rotunda where he joined a group of rioters in rushing and pushing aside several U.S. Capitol Police guarding the East Rotunda doors, allowing an even larger mob of rioters to flood the Capitol building. Judge Friedrich sentenced the defendant to 4 months' incarceration, the low number of the sentencing guidelines, followed by 12 months supervised release for the offense of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). In sentencing Daniel Johnson, Judge Friedrich noted the defendant's actions "demonstrated extreme disrespect for the law and the democratic process, it also put those police officers at enormous risk, and it heightened the risk to members of Congress, the vice president, and their staffers who the officers were defending." *Id* (ECF 75 at pg. 58).

---

[11] In addition to the Section 231(a)(3) offense, Mostofsky also pled guilty to 18 U.S.C. § 641 for stealing the protective gear, along with a misdemeanor trespass offense.

Although Johnson was sentenced to the low end of the sentencing guideline and Mostofsky to two months below the low end, neither defendant arrived at the Capitol prepared for violence or indicated a desire to find members of Congress. Such aggravating conduct warrants a sentence higher than the low number of the guidelines. In *United States v. Daniel Herendeen,* 21-cr-278-BAH, this Court found that the defendant's conduct of preplanning by bringing gear (a tactical vest) to engage in violence compounded with statements alluding to the likely hiding place of members of Congress required a *significant* penalty. *Id.* (ECF 91 at 60). Like Herendeen, Simon came prepared to engage in violence by wearing a tactical vest with ballistic plates when he stormed the Capitol. Additionally, Simon tried to find Members of Congress.

In any event, the goal of minimizing unwarranted sentencing "in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### F. Restitution

As noted above, Simon agreed under the terms of the plea agreement to pay $500 in restitution. At the original Change of Plea Hearing on October 15, 2021, the Court ordered the government to explain how it reached the restitution amount reflected in the plea agreement, which notes that, as of May 17, 2021, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages. *See* Plea Agreement, ECF 32 ¶ 10. The government has obtained updated loss figures from several agencies. As of April of this year, that amount was in excess of $2.7 million.

Determining the restitution amount is an "inexact science," *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009), that must be based on a "reasonable approximation of losses supported by a sound methodology," *United States v. Gushlack*, 728 F.2d 184, 196 (2d. Cir. 2013). The nearly $1.5 million figure quoted in Simon's plea agreement is the loss estimate provided by the Architect of the Capitol as of mid-May 2021. The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets. As a factual matter, the government is continuing to collect evidence concerning (1) the cost of damages to the Capitol Building and Grounds; (2) the costs associated with the deployment of additional police units to the Capitol on January 6; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by police officers and other victims.

As a legal matter, some of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to some defendants (*e.g.* defendants who broke a window or committed aggravated assault against a police officer). But other costs, including employees' work time, *see United States v. Wilfong*, 551 F.3d 1182, 1184

(10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, *see United Stated v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise.  To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses.  18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court to order restitution after the 90-day deadline under some circumstances).  None of these questions, however, arise in Simon's case.

### IV.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, those factors support a substantial sentence of incarceration.  Thus, the government recommends that this Court sentence Glen Mitchell Simon to 10 months of incarceration followed by one year of supervised released, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Barry K. Disney*
        Barry K. Disney
        KS Bar No. 13284
        Assistant United States Attorney – Detailee
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        Email:  Barry.Disney@usdoj.gov
        Cell:  (202) 924-4861

</div>